Ex. 3

Deposition of Carlos Guevara
Filed under seal per Order of 5/19/23
ECF No. 282



COURT REPORTING
LEGAL VIDEOGRAPHY
VIDEOCONFERENCING
TRIAL PRESENTATION
MOCK JURY SERVICES
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

PATRICK OGLESBEE
KATHREN D. OGLESBEE,

Plaintiffs,

vs. Case No.: 18-cv-560-GKF-CDL

GLOCK, INC., et al.

Defendants.

---

(800) 528-3335
NAEGELIUSA.COM

**HIGHLY CONFIDENTIAL**

**REMOTE VIDEOTAPED 30(b)(6) DEPOSITION**

**CARLOS GUEVARA, ESQUIRE**

**TAKEN ON**
**THURSDAY, SEPTEMBER 1, 2022**
**9:18 A.M.**

**SMYRNA, GEORGIA 30082**

Q. What is the priority to protect the safety of GLOCK gun owners?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean, it's absolutely important because the pistol is safe, so we make sure that every single product that we touch meets GLOCK factory specifications before it leaves the factory. So either brand new, or if we receive it from the customer for service, we are absolutely sure that that product is not going to leave the factory unless it meets all factory specifications.

BY MR. FRANSEEN:

Q. Is gun owner safety the highest priority for GLOCK, Inc.?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean, safety is important. I mean, I want to say safety for GLOCK employees is critical. Safety is -- I mean, I don't want to say what person is more important for the

HIGHLY CONFIDENTIAL

company, but safety is absolutely important because it's unforgiving business and mistakes could be very disastrous. I mean, we're working at the company with heavy machinery, chemicals, could be dangerous processes. And then we are dealing with handguns and light ammunition, so mistakes could be very dangerous. So safety at critical at every single step of the operation.

BY MR. FRANSEEN:

Q. And when you say mistakes, these are foreseeable mishaps or events that can occur that can cause, I think you said, disastrous injuries?

MR. RENZULLI: Objection to form.

THE DEPONENT: We have obviously processes to make sure that what we do is as safe as possible. We control everything that we can control. We provide all the training that is available. However, what we cannot control is when people goes outside the processes and they start making decisions on our own, which would be outside what would be our protocols. And if that brings some -- I mean, the consequence could be safety incidents, and we will of course deal with those consequences.

BY MR. FRANSEEN:

HIGHLY CONFIDENTIAL

Q. And that same concern for these events would occur with the safety of a gun owner and someone handling a GLOCK, correct?

MR. RENZULLI: Objection to form.

THE DEPONENT: Absolutely, yes, but I mentioned that any gun that we touch we make sure that it is absolutely safe before it leaves our control. So we are never going to ship to a customer a pistol unless we know is absolutely -- it is flawless. It has all factory components within the specifications.

BY MR. FRANSEEN:

Q. So it's GLOCK's opinion that the GLOCK 9 mm Generation 4 is flawless?

MR. RENZULLI: Objection to form.

THE DEPONENT: It's -- the Glock System is the best pistol design, the best pistol operation. It's incredible in the simplicity. I want to say it's a marvel in engineering, and as a result it's a safe pistol.

BY MR. FRANSEEN:

Q. Is the GLOCK 9 mm Generation 4 foolproof, as far as the SAFE ACTION System you described?

MR. RENZULLI: Objection to form.

18

HIGHLY CONFIDENTIAL

THE DEPONENT: I don't understand exactly what you mean by foolproof.

BY MR. FRANSEEN:

Q. Well, can GLOCK identify any scenarios that would cause the SAFE ACTION System to not operate as it intends?

A. I mean, that's -- the SAFE ACTION System is such that it is very robust and provide for a safe, a very, very safe platform and operation for the gun. But as any mechanical piece, it has to be maintained. The user needs to make sure that, of course, the parts are operating correctly and over time some components maintaining it in order to make sure that it's performing as designed. So yes, provided that the pistol is maintained and is with factory parts, it's a safe gun.

19

THE REPORTER: Do not consider what? I'm sorry.

THE DEPONENT: Evaluating or working on a gun with aftermarket components.

BY MR. FRANSEEN:

Q. But does GLOCK have any opinion where

20

HIGHLY CONFIDENTIAL

they've ran into multiple events where an aftermarket, a specific aftermarket component has caused the SAFE ACTION System to not engage correctly?

MR. RENZULLI: Objection to form.

I'm sorry. Madam Court Reporter, can you read that back for me, please?

THE REPORTER: I don't have the question, but has GLOCK ran into -- ran into multiple something a word aftermarket, specific aftermarket component or a similar aftermarket component has caused the SAFE ACTION System to.

And then you interrupted and said objection to form. I didn't get the last part when you said objection to form.

MR. RENZULLI: I'm not sure what you just said. I apologize. And the objection to form came after the end of the question. Maybe Derek you can just withdraw that question.

MR. FRANSEEN: I'll withdraw the question.

BY MR. FRANSEEN:

Q. When you said GLOCK has received firearms, and if they receive it with aftermarket parts -- I assume if they're receiving these guns with

21

HIGHLY CONFIDENTIAL

aftermarket parts, something wrong has occurred?

MR. RENZULLI: Objection to form.

BY MR. FRANSEEN:

Q. Is that correct?

22

Q. If someone sends in a gun, do they fill out a form?
A. Yes, for the most part. We have a form on the website where people provide some basic information when they ship the pistol to us, including their contact information, because we have to then get back to them sometimes for payment, sometimes for authorization for repair. Many different ways, yes.
Q. Where would I find this on the website?
A. Where?
Q. Um-hmm.
A. It will be on the bottom. On the landing page, when you go all the way to the bottom, it may say documents or Warranty or Technical Services. It's a one-page form.
Q. So it's -- would it be under, I've got Downloadable Materials?
A. Yeah. I'm not sure, but you can check there, and if it's something like says tech services or warranty, you can I mean click there and it should pull the form. Some people don't even do the

23

HIGHLY CONFIDENTIAL

form, just put some handwriting, just a piece of paper with a description of the issues and whatever they need to be done to the pistol.
Q. So you know whether that form includes whether they have identified any failures or concerns with their GLOCK firearm?
A. There is a space on that form for people to put whatever information they want, yeah. And usually -- they can mention the type of whatever work they want us to perform or whatever issue they want to be corrected. I mean, sometimes people just want to, let's say, upgrade some components, like -- and it's not usual, they only want night sights in style because they are old or they need -- so it's nothing wrong but they need some parts and stuff.

24

25



26

28

27

29

.

Q. Did you assist at all in the collection of documents related to plaintiffs request for productions?

A. Yes, I did. I was -- I coordinated that.

HIGHLY CONFIDENTIAL

been a drop safety type incident because that's what we were looking for here.

BY MR. FRANSEEN:

Q. Well, there's two ways you can look at a drop safety issue. One is you have an actual drop-fire, and the other one is you have a trigger reset failure. Those are kind of the two categories we agreed upon that would be searched. So did you only look for drop fire incidents?

A. No. Both drop fire and trigger reset issues, yeah.

Q. And in order to determine whether it was a trigger reset issue, did you personally review each and every work order that was labeled an operation issue for those two six year periods?

MR. RENZULLI: Objection to form.

BY MR. FRANSEEN:

Q. Two 3-year periods?

A. Correct. I personally reviewed those records. I did.

Q. Would you be able to pull a printout of those two 3-year periods that you searched just so we can see the number of work orders that would have an operational issue for the firearm?

HIGHLY CONFIDENTIAL

MR. RENZULLI: Objection to form. Outside the scope of discovery. Irrelevant. Stick to the issues. You can answer.

THE DEPONENT: I believe so, but I never had a printout in my hands. I had the actual work orders that I review. I didn't get a printout of the work orders from this query.

BY MR. FRANSEEN:

Q. Do you know whether William Carmichael pared down further documents without your review?

MR. RENZULLI: Objection to form.

THE DEPONENT: No. No, I got everything.

BY MR. FRANSEEN:

Q. Do you believe only a three-year period is relevant to determine whether GLOCK has knowledge of any trigger safety reset issues?

MR. RENZULLI: Objection to form. You're asking for a legal conclusion. You're going outside of the scope of not only a 30(b)(6) Notice but agreements among counsel.

MR. FRANSEEN: I have not agreed to a three-year period and you know that.

MR. RENZULLI: Excuse me. You have with the documents. You have the meet and confers.

HIGHLY CONFIDENTIAL

MR. FRANSEEN: You said preliminarily three years, and I asked for 15, so that's not an agreement. I want that on the record.

MR. RENZULLI: On the record, that's correct. And you wanted another three-year period, so I made them go back and do another three year period to satisfy you.

BY MR. FRANSEEN:

Q. Back to my question. Mr. Guevara, do you think that -- in GLOCK's opinion, is a three-year period the only period that they would review to determine whether there's a trigger reset safety issue?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean ,actually all together we looked at six years, and trigger safety is an absolutely solid, reliable part of the pistol. That's something that really doesn't fail.

BY MR. FRANSEEN:

Q. Would you want to consider more than just a three year period if you're determining the safety of your firearm?

MR. RENZULLI: Objection to form.

[redacted]

[redacted]

BY MR. FRANSEEN:

Q. But it could convey different information and different datapoints for the history of this firearm. Let's just if we limit it to a GLOCK 9 mm Generation 4, how long has that been in production?

A. Since 2010. Yeah, 2010.

Q. And were there many changes between the Generation 4 and Generation 3 regarding the SAFE ACTION System?

MR. RENZULLI: Objection to the form. And you're asking just in a general design issues?

MR. FRANSEEN: Correct.

BY MR. FRANSEEN:
Q. And those are the ones we just discussed, correct?
A. Correct.
Q. And those are only service orders if

HIGHLY CONFIDENTIAL
someone sends in their gun?
A. Correct.

Q. And so if I call up there and report a safety reset issue, what's the process?

HIGHLY CONFIDENTIAL
MR. RENZULLI: Objection to form.

46

BY MR. FRANSEEN:

47

HIGHLY CONFIDENTIAL

Q. Do you have emails --

MR. RENZULLI: Derek, you got to let him finish please.

48

HIGHLY CONFIDENTIAL

MR. RENZULLI: Objection to form.

THE DEPONENT: Yeah. Search terms in the email, yes. There are not -- those would be general emails. I mean, they are not maintained any different way. But yeah, I mean, search for search terms, it's possible.

BY MR. FRANSEEN:

Q. And that search hasn't been performed as of today, correct?

MR. FRANSEEN: Either I froze or he froze.

THE VIDEOGRAPHER: We're having some transmission issues here.

MR. FRANSEEN: They're back now.

MR. RENZULLI: What does it say?

THE DEPONENT: Internet connection is unstable. I think it's okay now.

MR. FRANSEEN: Yeah. I think it's okay now.

BY MR. FRANSEEN:

Q. My question was that search of those emails hasn't been performed today -- or as of today, correct?

MR. RENZULLI: Objection to form.

THE DEPONENT: Correct. I have not

49

HIGHLY CONFIDENTIAL

searched email, the email system.

BY MR. FRANSEEN:

Q. And were you involved in all of the searches for request for production?

A. Yes. I was involved. I was directing the production, the search, correct.

Q. Who is Kyle Aspinwall?

A. Kyle is a GLOCK District Manager. He's law enforcement salesperson for the Northeast.

Q. Was he involved in the search for these request for productions?

A. Kyle? No. I coordinated the search for records from the factory.

Q. Do you know what Kyle's involvement was if at all in answering discovery responses?

MR. RENZULLI: Can I interject here? He can answer your question. I'm letting you know about Kyle because you and I discussed this. Based upon Mr. Guevara's schedule, we didn't think we were going to be able to get him here to do this. And also once the dep notice changed into other areas, the decision was made, and Carlos was available to do that.

MR. FRANSEEN: Yeah. I'm not asking why

HIGHLY CONFIDENTIAL

areas that fall within the protective order. But for the time being, please mark every page as highly confidential, do not copy, subject to a protective order. Is counsel okay with that?

MR. FRANSEEN: Yes.

MR. RENZULLI: Madam Court Reporter, does that make sense?

THE REPORTER: Yes.

MR. RENZULLI: Thank you very much. Sorry, Derek.

BY MR. FRANSEEN:

BY MR. FRANSEEN:

Q. Would it be inappropriate for GLOCK to direct a consumer to a dealer who also sells aftermarket GLOCK parts?

MR. RENZULLI: Objection to form.

THE DEPONENT: Say that again. Would it be inappropriate for GLOCK, that was the question?

BY MR. FRANSEEN:

Q. Yeah. To direct a consumer who's interested in purchasing a GLOCK to a dealer who

HIGHLY CONFIDENTIAL

also sells aftermarket GLOCK parts?

MR. RENZULLI: Objection to form.

BY MR. FRANSEEN:

Q. Yeah. They do work on the exterior; they change out the backplates; GLOCK is well aware of this?

MR. RENZULLI: Objection to form.

BY MR. FRANSEEN:

Q. Correct?

A. Yeah. People do some work to make the gun look theirs, and --

Q. And they also do some work to affect the trigger pull, correct?

MR. RENZULLI: Derek, you've got to let him finish. Slow down. Deep breaths, please.

MR. FRANSEEN: He stopped his question. Did you have more to that answer?

MR. RENZULLI: I'm sitting next to him, Derek, please. I'm not making it up.

MR. FRANSEEN: Finish your answer then.

THE DEPONENT: Could you repeat the question, please?

HIGHLY CONFIDENTIAL

BY MR. FRANSEEN:

Q. Well, I asked you GLOCK is aware that people make changes to their exterior parts, including backplates, correct?

A. Yeah. You mean the slide cover plates?

Q. Correct.

A. Yeah. I mean, there are aftermarket slide cover plates. Yeah, I know that.

Q. And then my next question was, GLOCK is also aware that people make changes to the GLOCK firearm using aftermarket parts to affect the trigger pull?

MR. RENZULLI: Objection to form.

THE DEPONENT: Again, I am aware there are aftermarket manufacturers that offer a lot of different components and parts for GLOCK pistols. That's in response to the success of the GLOCK pistol, other companies try to provide -- I mean, benefit from the millions of guns out there.

BY MR. FRANSEEN:

Q. And people want to improve their GLOCK from the standard GLOCK, and they use aftermarket parts to do that?

MR. RENZULLI: Objection to form.

HIGHLY CONFIDENTIAL

THE DEPONENT: I honestly think -- I don't know what their intention is when they make changes. I think each person has their own whatever personal reasons for making those decisions. I do not believe you are improving the pistol by making changes. The pistol as it comes from the factory is good.

BY MR. FRANSEEN:

Q. But a consumer could believe they're improving it by making it a lighter trigger pull?

MR. RENZULLI: Objection to form.

THE DEPONENT: Whatever is in the consumer's mind, I mean, there are manufacturers out there that offer different trigger components, different springs, different parts. And they're in business because they are selling the product. But the question is are they improving? I don't think they're improving.

BY MR. FRANSEEN:

Q. Well, the question was a user could believe that they're improving it by installing these parts?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean, they could go after

HIGHLY CONFIDENTIAL

a different trigger feel that -- they get the GLOCK factory trigger and they maybe prefer something different. I don't know if that's improved, but it's a different feel. It's a personal -- it's how people relate to the product and believe that they are actually -- it's easier for them to handle. It's just more to their liking I guess.

BY MR. FRANSEEN:

Q. Right. And if they like it more, that's an improvement in their mind?

MR. RENZULLI: Objection to form.

THE DEPONENT: Honestly, I don't know. I can't answer because my GLOCK pistols are all factory stock, no modifications.

BY MR. FRANSEEN:

Q. Well, how long has GLOCK been aware that there are third party manufacturers that sell parts that are marketed for the GLOCK 9 mm?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean, there have been aftermarket part manufacturers for a long time. I want to say over 20 years that we know they have been out there.

BY MR. FRANSEEN:

HIGHLY CONFIDENTIAL



70

72

BY MR. FRANSEEN:
Q. What different types of firing pin springs do third party aftermarket manufacturers make?
MR. RENZULLI: Objection to form.
THE DEPONENT: I honestly don't know.
BY MR. FRANSEEN:
Q. Do you know whether they have reduced power ones, extra power ones?
A. I know there are different options. It could be both. I mean because people combine different parts to get to the results of their liking. So you can combine a striker spring with a trigger spring with a different connector with a different firing pin safety spring to achieve the -- whatever trigger feel that you like.
I mean it's -- we as GLOCK, as Glock we do

71

73

HIGHLY CONFIDENTIAL

offer some options for people to actually make some changes to their trigger, but those are the combinations that we test and offer to consumers.
Outside that, there are different, many different combinations, and some would be weaker, some would be stronger. But it's the overall package I guess, it's not just one part, it's the overall system that will produce whatever specific result the person is looking for.
Q. As we sit here today, is Glock aware of any combination of springs that would affect the safety, the trigger safety from engaging?
MR. RENZULLI: Objection to form.
THE DEPONENT: I think this case, this specific case I believe it was clear that the combination of the weaker striker spring and the heavier trigger spring and the connector, a minus connector or reduced connector, caused the -- I want to say the weaker firing safety spring created the whole situation where the pistol, the system would reset but the trigger safety didn't reset, is really an extreme condition. I want to say this is not normal, it's not normal to go to this extreme of modification. This pistol was heavily modified.

HIGHLY CONFIDENTIAL

BY MR. FRANSEEN:

Q. Well, you described three parts, and I believe Lone Wolf sold those three parts, and I believe still sells those three parts in a package, you know. If Glock has identified that combination of parts, should they notify the public and Glock Armorers to not install these into their firearms if they could cause safety engagement issues?

MR. RENZULLI: Objection to form. Mischaracterization of his testimony.

THE DEPONENT: I believe I mentioned four parts, four different aftermarket components.

BY MR. FRANSEEN:

Q. Well, what was the fourth? You mentioned the firing pin spring, the striker spring. You mentioned the extra power trigger spring. You mentioned the reduced power connector. What was the fourth?

A. The firing pin safety spring.

Q. Firing pin safety spring. So GLOCK is aware that the combination of those four springs that were changed out. Is it GLOCK's opinion that those four are all integral in this safety not engaging properly?

HIGHLY CONFIDENTIAL

MR. RENZULLI: Objection to form, and to the extent that you are now infringing upon the attorney-client privilege here. Can you answer without infringing upon the attorney-client privilege. Do you want to discuss it?

THE DEPONENT: I want to discuss it.

MR. RENZULLI: Give me a minute. Let me discuss it with my client. Do you want to take a break here or do you want to stay on the record?

MR. FRANSEEN: Let's take a quick five minute break. We've been going almost an hour again. Let's just take a ten minute break.

MR. RENZULLI: Sounds good.

THE VIDEOGRAPHER: The time is 11:06 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time is 11:17 a.m. and we are back on the record.

BY MR. FRANSEEN:

BY MR. FRANSEEN:

Q. And if GLOCK certifies an Armorer, do they prevent them from promoting or installing aftermarket parts?

A. That is a part of the GLOCK Armorer's course. There are doing instruction during the actual class. That's covered, not to install aftermarket parts. And also I believe it's part of the wording in the actual Armorer Certification that they will work on GLOCK pistols using factory parts instead of -- not using aftermarket parts.



78

80

BY MR. FRANSEEN:

Q. And would you be the person who would contact Armorers if their certifications are revoked?

A. Yes.

Q. Are you aware of any other Armorers whose certifications are revoked?

MR. RENZULLI: Objection to form.

THE DEPONENT: No.

BY MR. FRANSEEN:

79

81

BY MR. FRANSEEN:

Q. You have a written warning not to use these hand reloaded bullets, correct?

MR. RENZULLI: Objection to form.

THE DEPONENT: We have wording in our manual what we recommend not to use, reloaded ammunition, correct.

BY MR. FRANSEEN:

Q. I think there was another case in

90

MR. RENZULLI: But that was in the discovery though as you know.

MR. FRANSEEN: No. I never restricted it to only OEM parts.

MR. RENZULLI: This is a discovery issue --

MR. FRANSEEN: I'm asking --

MR. RENZULLI: Let me finish. We can discuss it offline, but I think you need to go back to the responses and the amendments and the supplements that you never had any further objection to. But we can talk about it --

MR. FRANSEEN: I'm asking the witness.

MR. RENZULLI: I understand that. For the record.

BY MR. FRANSEEN:

Q. Mr. Guevara, as the person who performed the searches, did you restrict your search to drop-fires to only drop-fires that included only OEM parts?

91

HIGHLY CONFIDENTIAL

MR. RENZULLI: Objection to form.

THE DEPONENT: No. Everything we had.

BY MR. FRANSEEN:

92

93



94

95

Q. Do you believe it's important if GLOCK is notified of a drop-fire event to determine the root cause?

96

HIGHLY CONFIDENTIAL

MR. RENZULLI: I'm sorry. Madam Court Reporter, can you read that back, please?

THE REPORTER: Do you believe it's important for GLOCK to be notified if a drop-fire event to determine the root cause, notified of a drop-fire to determine the root cause?

MR. RENZULLI: This is being recorded visually as well, right, Derek?

MR. FRANSEEN: Yes.

MR. RENZULLI: I'm concerned about this transcript, but okay. Objection to form.

THE DEPONENT: Obviously, we'll be interested for a GLOCK pistol have any type of failure with GLOCK parts. We don't hear much about people using aftermarket parts because I believe they will reach to either the manufacturer of the aftermarket parts or whoever did the installation for them if they have a problem.

97

BY MR. FRANSEEN:
Q. Does GLOCK offer options for a user to modify its firearm?
MR. RENZULLI: Objection to form.
THE DEPONENT: Yes. We do offer some customization for people to make some changes to a piece of their liking.
BY MR. FRANSEEN:
Q. So if they modify their part using a GLOCK part that you offer to, I think you said one is to reduce the trigger pull, that's allowed by GLOCK, correct?
MR. RENZULLI: I'm sorry. Can you read that back?
THE REPORTER: I was just going to ask him that very last part.
MR. RENZULLI: Can it be read?
THE REPORTER: He kind of mumbled there right at the very end. So if you think or modify a part using a GLOCK part that you offer. I think he

HIGHLY CONFIDENTIAL
said one to reduce the ...
MR. FRANSEEN: Trigger pull.
THE REPORTER: That's -- trigger pull. And then, that's when I said I'm sorry or you said, I'm sorry, can you repeat?
MR. RENZULLI: He's going to ask the question again.
BY MR. FRANSEEN:
Q. GLOCK offers options to modify their GLOCK firearms to users, correct?
A. Correct. We offer some limited level of customization.
Q. And so GLOCK allows customers to modify and offers those options, including options to reduce the trigger pull?
MR. RENZULLI: Objection to form.
THE DEPONENT: There is one option to reduce the trigger pull if they want to.
BY MR. FRANSEEN:
Q. What is that part that they can modify and alter their firearm to reduce their trigger pull?
A. It's not modified, the part. It will require to change the connector from the standard connector to the, what we call, the four and a half

HIGHLY CONFIDENTIAL
pound connector.
Q. Don't they also have a three and a half pound connector?
A. No.
Q. So there's nothing in your books that -- have you ever sold a 3.5 connector?
A. Many, many years ago it was, I believe, advertised as a three and a half pound connector, however it changed a long time ago to four and a half pounds because that in reality was the trigger pull of the gun. It's close to four and a half pounds than three and a half pounds, so that's what the customers were getting. And actually, it was maybe a mistake to call that three and a half pounds when in reality it is four and a half pounds. So for many, many years it has been four and a half pound connector.
Q. But Glock at one point advertised that you could put in a connector to reduce the trigger pull down to a three and a half pound pull?
MR. RENZULLI: Objection to form.
THE DEPONENT: Yeah. I mean, it has been offered. It is the same part today as it was before, but you get a four and a half pound trigger

HIGHLY CONFIDENTIAL
pull.
BY MR. FRANSEEN:
Q. Aren't there other modifications that an individual can perform on a GLOCK that GLOCK offers?
MR. RENZULLI: Objection to form.
THE DEPONENT: We offer a couple of trigger springs, in addition to the connector. One is the standard; the standard trigger spring is five and a half pound. Then, we can increase it. You can change that for what is called the New York-1 spring. You achieve maybe 8 pound trigger pull with that one --
THE REPORTER: I'm sorry. You can change it to what is called the New York what?
THE DEPONENT: New York-1 trigger. And that will increase the pressure to about 8 pounds. Or the New York-2 trigger, that will increase the pressure maybe another two pounds to around 10 pound trigger pull. So these triggers, of course, in combination with the two connectors, we can have whatever is the desired fit, and obviously those combinations are all tested by GLOCK, Inc., excuse me, by GLOCK many years, and they are options.
BY MR. FRANSEEN:

Carlos Guevara 30 b 6 September 1, 2022 NDT Assgn # 59624 Page 28

106

[redacted]

107

[redacted]

[redacted]

[redacted]

109

[redacted]

NAEGELI DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM





110

HIGHLY CONFIDENTIAL
BY MR. FRANSEEN:
Q. I'm going to pull up the GLOCK Instructions for Use, which is Bates stamped as GLOCK -- well, actually let's mark as Exhibit 2 that invoice. I believe it's GLOCK000046, the Bates number.
(WHEREUPON, Exhibit 2 was marked for identification.)
MR. FRANSEEN: I'm going to pull up and share my screen for the GLOCK Instructions for Use, which is Bates stamped as GLOCK000001 through 000027, and we can mark this as Exhibit 3.
(WHEREUPON, Exhibit 3 was marked for identification.)
BY MR. FRANSEEN:
Q. Do you have that in front of you?
A. Yes, I do.
MR. RENZULLI: Bates stamp 000001, right?
MR. FRANSEEN: Yes.
MR. RENZULLI: Got you.
BY MR. FRANSEEN:
Q. Can you identify what this document is?
A. It's the GLOCK Instructions for Use Manual.

111

HIGHLY CONFIDENTIAL
Q. And starting with GLOCK000001, there is a Warning. Can you generally tell us what that Warning is or Caution?
MR. RENZULLI: Which one, Warning or Caution?
MR. FRANSEEN: Let's go with the Caution.
THE DEPONENT: Do you want me to read or ...?
BY MR. FRANSEEN:
Q. Well, if you want to read it or you want to just generally tell me what the topic is. Well, I'll just -- is this Caution on GLOCK000001 telling individuals that the gun does not have an external manual safety?
A. Yeah. That's the intent, just to make sure that the user is fully aware that the pistol doesn't have a traditional external manual safety.
[redacted]
MR. RENZULLI: Objection to form. And you're going far afield here. You're talking about design issues, which you know is the second witness.
MR. FRANSEEN: Okay.

112

HIGHLY CONFIDENTIAL
BY MR. FRANSEEN:
[redacted]

113

[redacted]
BY MR. FRANSEEN:
Q. If you turn to GLOCK000002, there's a Warning here that, "GLOCK pistols have several internal design features and mechanical safeties, designed to prevent an accidental discharge should the pistol be dropped or receive a severe blow to the muzzle, front, or back of the pistol."
Is there anything in this instruction identifying what parts a user should not modify to effect those mechanical safeties?
A. Any and all components. We have a general warning not to alter or modify the pistol. It doesn't say don't change these specific parts. It says any part or component.
Q. Would it be important and reasonable to identify which component parts not to change out if they directly affect the internal safeties, the

114

HIGHLY CONFIDENTIAL

mechanical safeties of the GLOCK firearm?

MR. RENZULLI: Objection to form.

THE DEPONENT: I mean, it's the whole pistol. It's the whole SAFE ACTION System that provides the safe operation of the gun, so we are not going to say, don't change one part. We are saying don't change any part of the GLOCK pistol. So we cannot address one specific component. We just have a blanket statement recommendation to users not to alter or modify the GLOCK pistol.

BY MR. FRANSEEN:

Q. Well, users can change the connector?

A. They do. As long as they are using Glock factory parts, it's something that absolutely is as safe as -- I mean, it's safe.

Q. And users can put in different firing pin springs and different trigger springs?

MR. RENZULLI: Objection to form.

THE DEPONENT: Firing pin springs, we don't sell -- we only sell one firing pin spring.

BY MR. FRANSEEN:

Q. They're not additional New York firing pin springs, or are those just trigger springs?

A. Those are trigger springs.

115

HIGHLY CONFIDENTIAL

Q. But that's another modification that GLOCK advertises and expects individuals to use?

MR. RENZULLI: Objection to form.

THE DEPONENT: We don't change. The pistol remain with factory parts and there is no problem using GLOCK factory parts in the GLOCK pistol.

BY MR. FRANSEEN:

116

Q. So he's the person who you would go to regarding those questions, as well as him being presented today -- or being presented at a later date?

117

HIGHLY CONFIDENTIAL

A. Yes.

Q. What is his position?

A. He's Engineering.

Q. I'm going to turn to GLOCK000003. This talks about "... No outside lateral safety lever and no grip safety device." Do you know why you're warning individuals that this firearm doesn't have an outside lateral safety lever and no grip safety device?

A. Where are you looking?

MR. RENZULLI: Where are we?

MR. FRANSEEN: Bates stamp GLOCK000003, the top left, the Warning.

MR. RENZULLI: Page 5. Got you. Page 5.

THE DEPONENT: So why the Warning is there, is that the question?

BY MR. FRANSEEN:

Q. Yeah. Why are you advising people that they don't have these options?

A. That is just to make sure that they are aware that the pistol doesn't have those features, and then we get into explaining what the pistol has and how it works. I mean, we want to make sure that there is no misunderstanding and people later

154

HIGHLY CONFIDENTIAL

MR. FRANSEEN: Just start at 002351.

THE DEPONENT: Okay.

MR. RENZULLI: Okay.

156

155

157

158

Q. Who is Bob Radecki?
A. He's a national sales manager for GLOCK.
Q. And is W.C. Wolff one of Bob Radecki's

160

HIGHLY CONFIDENTIAL

accounts?
MR. RENZULLI: Objection to form.
A. It's -- I mean, we have 800 employees, and each person may have accounts with different people. So if -- if Bob Radecki has an account with Lone Wolf, that would be at his -- him as a person, which that very well be possible.
Q. Well, I guess -- I was asking about W.C. Wolff, not Lone Wolf. It can get --
A. Well --
Q. -- confusing.
A. Okay.
Q. Yeah.
A. Same answer.
Q. Okay. What is your understanding about the relationship between GLOCK, Inc. and W.C. Wolff?
A. There is no relationship. I know we may have order as a company a very few parts, but that's about it. We don't have any -- any other relationship.
Q. Well, W.C. Wolff has stated in discovery responses that they established an account for GLOCK in 1989. They also represent they have had multiple conversations with GLOCK representatives, primarily,

159

161

HIGHLY CONFIDENTIAL

I believe, regarding magazine springs. Are you aware of that relationship?
MR. RENZULLI: Objection to form.
A. Okay. Any type of conversation back in the '80s, I -- I absolutely have no information. All I know is that they -- all the parts are manufactured in Austria, so I find extremely unusual and unbelievable that -- that any part would be sourced in the U.S. because that has never happened.
Q. But you haven't done any investigation to confirm that; have you?
A. I ask the people in the company, but nobody goes back to -- to that time.
Q. Is Bob Radecki still with the company?
A. Yeah, he's with the company.
Q. Did you ask Bob Radecki about GLOCK, Inc.'s relationship with W.C. Wolff?
A. I asked him about that, and he joined the company 2006, I believe. So nobody -- I mean, going back to the '80s, he was -- I mean, we're talking about many year before he even started working for GLOCK.
Q. Do you know if W.C. Wolff was a sponsor for the GLOCK competition shooting team from 2000

166

168

Q. Who is Dave Sevigny?
A. Dave Sevigny used to be the team captain for the GLOCK shooting team.
Q. Is he still in contact with GLOCK?
A. No. He worked for GLOCK from about 2003 to 2011.
Q. What about Julie Goloski?
A. She was a shooter, not hired by GLOCK, and she was a member of the shooting team in the mid-2000s for just maybe a couple of years.

167

169

Q. Who is Fred Burchard?
A. He -- he was a GLOCK employee that work in GLOCK GSSF, and before that he was a couple of years in the -- in technical services. He -- he died about five years ago, four or five years ago.
Q. Do you know what his communications were with W.C. Wolff?
A. No. As a -- as a -- nothing -- I know nothing formal from the -- on behalf of the company. He may have communications -- he was -- he likes guns. He had all type of different guns from rifles to guns, pistols, revolvers. He was -- he was a gun person, so --
Q. Who is Craig Dutton?
A. He used to work with GLOCK in 2010 or '11 in the sales -- as a sales -- Assistant Sales Manager.
Q. Do you know what his communications were with W.C. Wolff?
A. No. He was in the industry for a long time, so he -- as a salesperson he would travel to trade shows and different events and -- I mean, I



HIGHLY CONFIDENTIAL

wouldn't be surprised if he established personal relationship with a lot of companies and -- I mean, he's a sales guy so --

Q. Who is Alan Gibson?

A. I don't know that person.

Q. Who is Josh Dorset?

A. I believe you're -- Josh Dorsey?

Q. I have it as Dorset, D-o-r-s-e-t.

A. No. We have a Josh Dorsey, but no Josh Dorset.

Q. Well, if it's -- if it's just spelled wrong, who would Josh Dorsey be?

A. He's our Vice-President of Sales at GLOCK, Inc.

Q. Are you aware of his communications with W.C. Wolff?

A. I ask him, and he had none.

Q. What about Steve Palinkas?

A. He used to be a sales guy for GLOCK in, oh, Texas, I believe -- no. North. But we're talking about early 2000s, mid-2000s.

Q. And is he still with GLOCK?

A. No. He left long time ago.

Q. Did you make any attempts to reach out to

HIGHLY CONFIDENTIAL

him?

A. No.

Q. Do you know if anyone at GLOCK still has contact information for Mr. Palinkas?

A. No. No, other than -- than whatever is -- what his last contact that we may have in HR, but I don't know anything about him.

Q. I'm going to pull up -- it starts at WOLFF 0000F27. Do you have that in front of you?

MR. RENZULLI: Hang on one second.

MR. FRANSEEN: Yep.

MR. RENZULLI: Okay.

THE DEPONENT: Okay.

MR. RENZULLI: You good? Okay.

BY MR. FRANSEEN:

Q. And while you're doing that, is Bob Radecki, is he still employed with -- with GLOCK?

A. Yes, he is.

Q. Did you ask him about his communications with W.C. Wolff?

A. I did.

Q. What did he say?

A. He mentioned that he had a personal relationship, a friendship, with somebody from

HIGHLY CONFIDENTIAL

there, Davey, I believe his name. That relationship goes back 25 years or so, and -- and Bob, I believe he mentioned that he -- he got to know him because he's a competition shooter, and in that environment they -- they became friends. So he has a personal friendship with him way before he joined GLOCK.

Q. But they also talked business-related items and -- and GLOCK-related items, correct?

MR. RENZULLI: Objection to form.

A. It's -- there is no business between GLOCK and -- and Wolff, W.C. Wolff. Any communication between Bob and -- and Davey would be as a friends - - as friends.

Q. And in these there's a series of emails between Dave Koebensky and Bob Radecki, correct?

A. Yes. You follow -- yes.

Q. I want to turn your attention to WOLFF 000086.

A. Okay.

Q. And there's an email from Wednesday, July 3rd, 2013, from Bob Radecki to tech. Do you know who tech is?

A. I -- I don't know. Looks like it's from



HIGHLY CONFIDENTIAL

-- directly from Wolff Company.

Q. Well, these are records to -- correspondence between W.C. Wolff and GLOCK. Do you know who tech would be?

A. I believe that tech refers to a tech at W.C. Wolff.

Q. Okay. And this is talking about Wolff recoil springs eating a GLOCK 20.

A. That's the description from Wolff customer, yes.

Q. And Bob Radecki says have the customer contact me and I'll get him taken care of.

A. Yeah. The customer is reporting to Wolff that they had a problem with the -- with the -- with their spring that seems to damage the frame, I believe.

Q. And let's --

A. So --

Q. -- go to WOLFF 000088.

A. Okay.

Q. There at the bottom, a email from Bob Radecki to Jay Christianson. Do you know who Jay Christianson is?

A. I don't know. Don't know the -- no.

HIGHLY CONFIDENTIAL

Q. And this is, again, the subject is regarding a GLOCK 20 and Wolff recoil spring, correct?

A. Yes.

Q. And he tells Mr. Christianson that they will replace the frame at no charge.

A. Yes, he's saying that.

178

179

Q. You were sent another document that was us.GLOCK.com, gearfire.com link. It has photos of certain websites on it.

MR. RENZULLI: Yeah, it looks like some type of a cut and paste, if I have the right one.

A. One page.

Q. I think it's two pages.

A. One is a picture of the GLOCK 17, and the

180

HIGHLY CONFIDENTIAL

other one is some pictures of -- of parts?

Q. Correct. So this GLOCK 17 picture that you're referring to, that's from the GLOCK website, correct?

A. Yeah, it looks like.

Q. And there's a link there that says buy now.

A. Mm-hmm.

Q. There's two websites that GLOCK refers people to, this one that's a fire -- it's like a little fire link and then one that says guns.com right below the buy now, and that's where individuals can buy this GLOCK firearm after being redirected from GLOCK's website.

A. I believe that when you click on that it will redirect you to some type of dealer where you can actually go -- I mean, you don't buy guns online. You have to go to a -- to a -- to a licensed dealer and the location to -- to actually do a transaction.

Q. Well -- well, this link sends them to gearfire.com if you click on it. Were you aware of that?

A. Okay.

181

HIGHLY CONFIDENTIAL

Q. And gearfire.com sells aftermarket parts.

MR. RENZULLI: Objection to form.

MR. FRANSEEN: On the second page there's some other screenshots listed there, and we'll -- we'll -- we'll list this as Exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

THE DEPONENT: Yeah, as long as it -- they clearly indicate what is a GLOCK part, what is not, then there is no -- and there is no confusion to the consumer, then actually we have no problem with them selling aftermarket parts.

BY MR. FRANSEEN:

Q. And you're actually directing GLOCK consumers who are going to the GLOCK website to this website that also contains aftermarket parts that you say should not be installed inside a GLOCK.

MR. RENZULLI: Objection to form.

A. We -- I mean, they're -- we're directing them for the pistol, and this website happens to have addition of parts, so -- but as long as the parts are clearly marketed and information on the parts is clear what is the source of the part, we -- we -- we will have no problem.



182

HIGHLY CONFIDENTIAL

[redacted]

Q. Do you have a dealer agreement with gunfire.com -- or gear.fire.com?

A. I don't -- I don't know the answer. I don't think so.

Q. Who from GLOCK, Inc. approved gearfire.com being promoted on its website?

MR. RENZULLI: Objection to form.

A. I don't know. But I don't think gearfire.com is a dealer. I -- I -- I don't -- I don't -- I'm not familiar with how that works, but I don't think that's a dealer. I don't think you -- you -- you buy a gun from gearfire that -- I mean, I guess they direct -- there may be multiple dealers, maybe multiple FFLs under that banner. I guess it's -- it's more like a platform for dealer to dealers to -- to join. I don't think that's -- there's on dealer called gearfire.com.

183

HIGHLY CONFIDENTIAL

Q. Well, there is a gearfire.com, and your website links to it, and if they don't sell firearms, are you only sending them there to view their aftermarket parts?

MR. RENZULLI: Objection to form.

A. There is a -- no. I mean, it's for the pistol, but they -- they have to -- the person who is buying the gun is going to have to get it at their -- at whatever fulfill the state where they live.

So I'm saying it's not gearfire.com will be selling the pistol. It's going to be a business that is using the platform. Gearfire. -- gearfire.com is only a platform.

Q. I'll turn your attention to the subject event. Do you have any formal opinions or -- or -- as the GLOCK Corporate Representative, do you have any formal opinions as to how this drop fire occurred?

MR. RENZULLI: Objection to form.

MR. SNAPP: Objection to form. Randall Snapp.

MS. LISLE: Objection to form. Rachal Lisle.

184

HIGHLY CONFIDENTIAL

THE DEPONENT: I mean, without -- without -- obviously without being there, all I can say is that the -- the -- the pistol wasn't under control of Mr. Oglesbee, and -- and he lost control of the gun in the process of holstering the gun and -- and drop it.

The pistol, based on -- on -- on the information I -- I have, discharged, it was -- when it hit the ground. I believe that's -- that's based on the trajectory of the - - of the bullet. That was the basic event.

I mean, obviously, they -- they -- the pistol itself was heavily modified at the moment this incident happened. That's --

BY MR. FRANSEEN:

Q. It --

A. I mean -- and what I want to make -- what I want to make clear is that that was not the condition the pistol was shipped from the factory when it was sold back in 2012, from the invoice that we noticed that -- we saw initially.

The pistol when it left the factory was tested, checked for quality control. All the tests were performed, and it only had GLOCK factory

185

HIGHLY CONFIDENTIAL

components. It was not in the condition that it was found after this incident.

Q. But GLOCK knows and can foresee that a user will modify its firearm with these aftermarket parts, including Lone Wolf parts, W.C. Wolff parts, and other aftermarket component makers.

MR. RENZULLI: Objection to form.

A. It's possible, yes.

Q. Why do gun manufacturers put in safeties to prevent drop fires?

MR. RENZULLI: Objection to form.

A. Because if they -- I mean, it's -- it's a -- if it happen -- I mean, if somebody drop the gun, the pistol should be -- should be designed to prevent the fire from happening, which is -- which is what is in the GLOCK SAFE ACTION system so it's - - it has a system in place to prevent discharges if the -- if the pistol is dropped.

Q. Because it's foreseeable that under normal circumstances a user may potentially drop a firearm.

MR. RENZULLI: Objection to form, legal conclusion.

A. I mean, it's -- the -- the -- the pistol is designed to handle a drop without any problem.

HIGHLY CONFIDENTIAL

A. Any drop -- again, any drop, the safeties of the gun are there to prevent discharge for any drop.

Q. You said that Mr. Oglesbee, because he's an experienced firearm user, should know whether this whether this GLOCK firearm was heavily modified. Can you explain to me what in his background made him an armorer?

MR. RENZULLI: Objection to form, mischaracterization of testimony. You can answer.

A. He -- I mean, he's, of course, a military person, very familiar with all -- I mean, different type of firearms, a trainer with very -- I mean, a lot of experience in -- in -- in the training area. So he is not a new shooter by any means.

So he -- he's expected, really from -- based on his training and -- and -- and profession, to really know the condition of his gun. I mean, it's his tool. He's -- he's a trainer. That's his tool. That's his working tool. He -- he's making a living out of that.

I'm -- I'm -- I'm very concerned if somebody in that line of work doesn't even know the condition what he has in his hands, so -- and he --

HIGHLY CONFIDENTIAL

he owned the pistol for four years. He -- I'm very confident that he fired thousands of rounds during that time.

The pistol should have been maintained, parts that worked should have been changed. So there's a lot of things that happened during those four years that should have -- he should have been aware of what was in his hands.

Q. My question was: Is Mr. Oglesbee an armorer?

MR. RENZULLI: Objection to form.

MR. SNAPP: Object to form. Randall Snapp.

THE DEPONENT: Well --

MS. LISLE: Objection to form. Rachal Lisle.

THE DEPONENT: -- he's -- he's not a GLOCK armorer, but he's a professional firearms -- I mean, a person very professional and proficient in firearms.

BY MR. FRANSEEN:

Q. Do you have anything in your manual that tells someone if they are a professional firearms shooter that they should then go beyond the field

HIGHLY CONFIDENTIAL

stripping, that you instruct that all users to stop at that point?

MR. RENZULLI: Objection to form.

A. No.

Q. So Mr. Oglesbee following GLOCK's instructions should have stopped at field stripping and not inspected additional parts?

A. What -- what we mention in the manual is that if the pistol is used in a professional setting, law enforcement training, that type of setting, requires even additional maintenance of the pistols used for regular user. And that regular maintenance, of course, includes -- if he's not an armorer, he will have to bring the -- the gun to an armorer, inspect it.

So the point being is, during his four year of ownership at the level of use that he had the gun, that gun require maintenance, inspections, parts need to be changed, just to make sure there is a level -- at a high rating and operational level.

Q. Can you pull up Exhibit -- I believe it's Exhibit 2, the Instructions for Use -- the 2011 Instructions for Use. Do you have those?

A. 2011.

HIGHLY CONFIDENTIAL

MR. RENZULLI: Yeah, yeah.

THE DEPONENT: Okay.

MR. RENZULLI: I think so.

BY MR. FRANSEEN:

Q. Again, these are the Instructions for Use that Mr. Oglesbee would have had that were included with the firearm upon purchase, correct?

A. Yes.

Q. Can you point to me what page that you say that there's additional maintenance that's required for professional users?

A. Give me a moment. Still looking. Oh, yeah, it's actually on -- on what I was referring to -- it's actually -- actually page three at the bottom, the same section that we actually read before, like any other mechanical device when subjected to extreme forces not normally encountered in sporting, law enforcement, or military use, part of the failure -- a part failure could occur.

The proper and safe function of this pistol is based on the premise that parts are not altered or modified, and the pistol is used for its intended purpose. So that's -- that's what I was thinking about.

194

HIGHLY CONFIDENTIAL

Q. Well, this is saying that sporting, law enforcement, or military use are normal forces. Those are -- those are the items that are describing in that language are normal practice and uses. That's what the gun is designed for. And there's nothing in that warning that tells them that they have to have additional inspections.

There's nothing in that warning that tells them that what parts will wear out. There's nothing in the warning that tells them that there needs to be additional parts changed out frequently; is there?

MR. RENZULLI: Objection to form. That was about 12 questions, counselor. It's called compound. Relax. Show some respect here, and he'll answer your questions.

A. Not -- not in this one. I believe the wording is in the later version of the manual.

Q. Did you -- did you understand my compound question?

MR. RENZULLI: Objection to form.

You're asking him if he understood your question?

(Simultaneously speaking.)

195

HIGHLY CONFIDENTIAL

MR. FRANSEEN: Yeah. I'm trying to see if he understood the compound or if --

MR. RENZULLI: No. No. You --

MR. FRANSEEN: -- I need to break it down.

MR. RENZULLI: You can (audio disruption). Okay?

THE REPORTER: (Audio disruption.)

MR. RENZULLI: Follow the rules.

MR. FRANSEEN: Did you just overrule? Did you make a ruling on this?

MR. RENZULLI: I said follow the rules, Counselor. We'll leave that --

BY MR. FRANSEEN:

Q. Mr. Guevera, nothing in that warning tells people that sporting and shooting requires additional checks; does it?

MR. RENZULLI: Objection to form.

A. Correct, no, it doesn't.

Q. Nothing in -- nothing in that warning tells a user that they -- if they are involved as a shooting instructor that they need to have additional parts changed out more frequently.

MR. RENZULLI: Objection to form.

A. No. I believe maintenance of the gun

196

HIGHLY CONFIDENTIAL

dictates that if you're using the gun heavily, that would require more maintenance than ones that's just maybe once or twice a year.

Q. Is there any instruction that tells what is considered heavy use that requires additional inspections of the firearm?

MR. RENZULLI: Objection to form.

A. No. I mean, I believe record when the pistol needs to be cleaned and -- but not -- I mean, the actual work. If there is an issue, of course, the person is going to take the pistol to their -- for service.

Q. Is there any requirement that a GLOCK get brought in to a certified armorer regularly?

A. We mention -- not regular, but we mention on the -- on the manual that changes need to be made by a certified GLOCK armorer. Anything beyond the normal cleaning, field stripping of the gun, changes of the gun, needs to be made by GLOCK certified armorer.

Q. I'm going to share my screen here, and it is -- GLOCK0028321 is the beginning document here.

A. Okay.

MR. RENZULLI: Let me see if I can get

197

HIGHLY CONFIDENTIAL

that. That wasn't part of the stuff yesterday?

MR. FRANSEEN: I believe it was on the Bates numbers that I --

MR. RENZULLI: Yeah.

MR. FRANSEEN: -- identified.

MR. RENZULLI: Yeah, I don't think so. You're going to have to give me a minute. They weren't on there, Derek. The Cloud is what we wanted.

Want to take a break? How much longer do you think?

MR. FRANSEEN: Well, I did -- I -- can we -- can we try to just look at this document on -- on the screen real quick?

MR. RENZULLI: I just asked you a question. I said can you look --

MR. FRANSEEN: If you want to take a break, we can take a break.

MR. RENZULLI: Derek, I'm just asking you a question. Do you have an idea of how much longer you're going to go?

MR. FRANSEEN: Probably 30 minutes or so.

MR. RENZULLI: I'm conferring with the witness. Its been a long day. Let's see where we

Carlos Guevara 30.b.6 September 1, 2022 NDT Assgn # 59624 Page 55

214

216

215

217

NAEGELI DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

218

220

219

221

MR. RENZULLI: Madam Court Reporter, I'm



226

[redacted]

Q. Was the GLOCK pistol also being evaluated by California and Massachusetts?

A. Yeah. Some states during the approval process, they -- they have a specific requirement that the pistol needs to be submitted for -- for a third-party evaluation where it's subject to both function and safety tests and operational tests before it's approved for selling to states.

227

HIGHLY CONFIDENTIAL

Q. Would it be a fair statement that the GLOCK pistol is the most tested and evaluated semi-automatic pistol in the world?

MR. FRANSEEN: Objection to form.

A. As far as handguns, semi-automatic pistol, I -- I -- I would venture to say yes, in a way that it's -- it's carried by about 75, 80 percent of law enforcement agencies in the U.S., federal, state, local, and with all those -- with the requirements, safety being, of course, a major concern.

The -- the design itself has been, I want to say, copied, if not directly very close by a lot of manufacturers, I believe the following the success of GLOCK, and -- and it's -- it's, I want to say, the most tested gun, at least in the U.S.

Q. If the law enforcement does its testing and evaluation, what is your understanding of what factors they consider?

A. They would consider whatever it is on the specific RFB, whatever -- whatever they are looking -- whatever they are looking for. It's always -- some agencies have specific issues, however, in general, they -- they want, of course, a safe gun and a reliable gun.

228

HIGHLY CONFIDENTIAL

Usually they have very specific requirements, safety -- regarding safety, and it's very -- I mean, the overwhelming majority of agencies specifically request guns without external manual safety, without a magazine disconnect safety, without a grip safety, and request that their safeties will be internal operation on the pistol.

[redacted]

Q. Have you, sir, ever practiced law without a license?

229

HIGHLY CONFIDENTIAL

A. No, I did not.

Q. Is it your understanding that Mr. Oglesbee's trigger safety was not operational in his gun?

A. The trigger safety his gun was operational. In this case, my understanding, it was defeated by the presence of other aftermarket components that prevented the trigger from actually moving all the way forward as we mentioned before.

Q. How many GLOCK pistols have been sold in the U.S.?

A. Over 22,000,000 pistols.

Q. How would a user know whether or not their -- their pistol's trigger safety is -- is working or not working?

A. There is a -- first, visually, there's an indication because out of the three safeties of the GLOCK SAFE ACTION system, that's the -- that's external, the other two safeties are internal, so there's a -- there's clearly a visual indication where the -- the trigger safety is engaging, and in any case, the -- the manual provides clear instructions to test the -- the function of the -- of the trigger safety.


230

HIGHLY CONFIDENTIAL

Q. How many different combinations can you think of of aftermarket parts there'd be for -- for GLOCK pistols?

MR. FRANSEEN: Objection to form.

A. It's -- it's -- its' -- it's impossible for a number, but I want to say it's -- it's in the millions, provided we have maybe few hundred manufacturers, and each one will make a handful or maybe more components. When you combine those different combinations, it's -- it just makes that combination impossible to -- to -- to -- to determine.

Q. Have you ever heard of any firearm manufacturer even try to enforce any kind of a requirement on the distributors or dealers to not sell any aftermarket parts?

MR. FRANSEEN: Objection to form.

A. Not my knowledge. I -- I -- I talk to people in my position in other companies and I also visit dealers, and they will carry multiple lines and -- and they sell parts. It's very standard. So I'm not aware of any other gun manufacturer in the U.S. that will restrict the -- the dealers to sell aftermarket parts.

231

HIGHLY CONFIDENTIAL

MR. RENZULLI: I appreciate your time here today. Thank you.

MR. FRANSEEN: I have a few questions following up on Mr. Renzulli's question.

FURTHER EXAMINATION

BY MR. FRANSEEN:

Q. What studies have you reviewed that identify or evaluate whether GLOCK is the most tested or evaluated gun in the United States or the world?

A. As I mentioned, matter fact, that GLOCK is the gun of choice of 75 percent of law enforcement agencies in the U.S. only, state, federal, and -- and local, and during those testing, we are confronted with, of course, competitors or manufacturers, and -- and the GLOCK pistol is the one selected overwhelmingly by law enforcement after they conduct these testings. So it's not just one report. It's an overwhelming number of agencies after testing the GLOCK pistol decided to carry the gun.

Q. But you mentioned that there's other competitors that are also tested during the same time period. They submit bids as well; is that

232

HIGHLY CONFIDENTIAL

true?

A. Yeah. We -- it's very standard. We're not the only ones competing. I mean, it's very, very important market, and -- and we are competing with other manufacturers. The good news is that most of the time we come ahead.

Q. What -- but you have no basis, factual basis, you're just assuming that since you're selected a lot that you're -- you're making this statement you're the most evaluated and tested in the world.

MR. RENZULLI: Objection to form.

A. I don't know if any other company that has been tested to a level of testing that we have, I mean, yes.

Q. Have you asked any of these companies how often they're tested?

A. No, but we are -- we are there most of the time. Sometimes we face -- we don't face the same companies all the time, but we are there all the time, and the testing itself shows the fact that we come ahead, and basically that tells me that the pistol actually did what it was supposed to, in some ways better than the competition.

233

HIGHLY CONFIDENTIAL

Q. Are you able to factually show through data that the GLOCK firearm is the most evaluated and tested firearm in either the U.S. or the world?

MR. RENZULLI: Objection to form, asked and answered.

Go ahead.

A. Just the overwhelming preference by government agencies prove that it's the most tested pistol.

Q. Who are your common competitors for these law enforcement bids?

MR. RENZULLI: Objection to form.

Go ahead.

A. It's -- I mean, Sig Sauer, Beretta, Springfield, Smith & Wesson.

I mean, sometimes you have people that show up from time to time. It's -- it's tireless. I mean, that's -- that's the majority. I mean, you know, you have others that just show up and they -- it's not really relevant.

Q. You mentioned with aftermarket part manufacturers that there's too many combinations to even begin testing. Aren't there, even if there's multiple manufacturers, similar springs that are

**Patrick and Kathren Oglesbee v. Glock, Inc., et al.**
**Case No.: 4:18-cv-00560-GKF-CDL**
**PRIVILEGE LOG FOR**
**DEPOSITION OF CARLOS GUEVARA**

| Page/Line Number | Privilege | Reason |
|---|---|---|
| 213:24 – 221:24 | Highly Confidential | Commercially Sensitive |

**Patrick and Kathren Oglesbee v. Glock, Inc., et al.**
**Case No.: 4:18-cv-00560-GKF-CDL**
**PRIVILEGE LOG FOR**
**DEPOSITION OF CARLOS GUEVARA**

| Page/Line Number | Privilege | Reason |
|---|---|---|
| 12:20 – 15:6 | Confidential | Commercially Sensitive |
| 18:18 – 19:19 | Confidential | Commercially Sensitive |
| 21:6 – 22:3 | Confidential | Commercially Sensitive |
| 23:17 – 29:8 | Confidential | Commercially Sensitive |
| 29:13 – 29:25 | Confidential | Commercially Sensitive |
| 30:5 – 31:4 | Confidential | Commercially Sensitive |
| 32:20 – 33:10 | Confidential | Commercially Sensitive |
| 36:25 – 37:13 | Confidential | Commercially Sensitive |
| 38:2 – 38:14 | Confidential | Commercially Sensitive |
| 38:22 – 39:13 | Confidential | Commercially Sensitive |
| 40:4 – 40:15 | Confidential | Commercially Sensitive |
| 41:8 – 42:20 | Confidential | Commercially Sensitive |
| 43:4 – 43:23 | Confidential | Commercially Sensitive |

| | | |
|---|---|---|
| 44:3 – 46:24 | Confidential | Commercially Sensitive |
| 47:5 – 47:25 | Confidential | Commercially Sensitive |
| 58:10 – 61:9 | Confidential | Commercially Sensitive |
| 62:13 – 63:15 | Confidential | Commercially Sensitive |
| 64:4 – 65:5 | Confidential | Commercially Sensitive |
| 69:2 – 72:9 | Confidential | Commercially Sensitive |
| 75:21 – 77:10 | Confidential | Commercially Sensitive |
| 77:22 – 80:5 | Confidential | Commercially Sensitive |
| 80:16 – 81:11 | Confidential | Commercially Sensitive |
| 81:20 – 83:19 | Confidential | Commercially Sensitive |
| 89:11 – 90:5 | Confidential | Commercially Sensitive |
| 91:5 – 95:22 | Confidential | Commercially Sensitive |
| 96:20 – 98:5 | Confidential | Commercially Sensitive |
| 102:1 – 109:25 | Confidential | Commercially Sensitive |
| 111:19 – 111:21 | Confidential | Commercially Sensitive |
| | | |

| | | |
|---|---|---|
| 112:3 – 113:8 | Confidential | Commercially Sensitive |
| 115:10 – 116:21 | Confidential | Commercially Sensitive |
| 152:4 – 152:9 | Confidential | Commercially Sensitive |
| 152:17 – 153:14 | Confidential | Commercially Sensitive |
| 154:5 – 159:22 | Confidential | Commercially Sensitive |
| 163:17 – 168:9 | Confidential | Commercially Sensitive |
| 168:20 – 169:3 | Confidential | Commercially Sensitive |
| 172:15 – 173:15 | Confidential | Commercially Sensitive |
| 175:9 – 179:17 | Confidential | Commercially Sensitive |
| 182:2 – 182:8 | Confidential | Commercially Sensitive |
| 198:5 – 200:14 | Confidential | Commercially Sensitive |
| 203:18 – 204:6 | Confidential | Commercially Sensitive |
| 212:6 – 212:14 | Confidential | Commercially Sensitive |
| 213:2 – 213:16 | Confidential | Commercially Sensitive |
| 225:22 – 226:17 | Confidential | Commercially Sensitive |
| | | |

| | | |
|---|---|---|
| 228:9 – 228:23 | Confidential | Commercially Sensitive |